## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

TERIANA JONES and BETHANY MORRISSEY,
on behalf of themselves and a class of employees
and/or former employees, similarly situated,

        Plaintiffs,

        v.                  Case No. 17 cv 125

CRUISIN' CHUBBYS GENTLEMEN'S CLUB, et al.,

        Defendants.

## PARTIES' AMENDED BRIEF IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT AND FINAL CERTIFICATION OF FLSA AND RULE 23 SETTLEMENT CLASSES

## PRELIMINARY EXPLANATION OF DIVISION OF SETTLEMENT PROCEEDS

Given the complexity of this case and the special logistical issues associated with it, class counsel begins this brief with a summary explanation of its proposed division of the settlement proceeds.

| | |
|---|---|
| Total settlement amount: | $400,000 |
| Base amount to be allocated to class: | $244,313.96 |
| Amount allocated to the class for *per capita* recovery: | $122,156.98 |
| Amount actually paid on a *per capita* basis: | $46,706.92[1] |

---

[1] This amount presumes the Court will keep the four dancers who did not receive notice by mail in the class, and will allow the five dancers who filed late claims to join the class.  In fact, all of the figures in the preliminary explanation are set forth under that assumption.

| | |
|---|---|
| Supplement from attorney fee request: | $11,569.48 |
| Amount to be allocated for *pro rata* recovery: | $122,156.98 |
| Amount actually paid on a *pro rata* basis: | $61,688.62 |
| Supplement from attorney fee request: | $19,299.60 |
| Balance after *per capita* and *pro rata* shares paid: | $138,383.06 |
| Additional amount to class | $67,959.21 |
| Amount to reversion fund: | $67,959.21 |
| **Total amount paid to class**: | $203,792.94 |
| Amount for incentive pay: | $18,000 |
| To Jones: | $10,000 |
| To Morrissey: | $8,000 |
| Amount to attorney fees and costs: | $106,816.96 |
| Amount to attorney fees: | $102,450.92 |
| Amount to costs: | $4,366.04 |

## INTRODUCTION

The Plaintiffs, women who performed as exotic dancers at a nightclub owned by P.T.B., Inc., assert that they and other dancers were miscategorized as independent contractors rather than employees, and are therefore entitled to be paid minimum wages, plus overtime.  They also assert that dancers were required to share tips and that a portion of the dance fees (which they seek to characterize as tips) were wrongfully taken from them (this is cast alternatively as a wage issue and as conversion or unjust enrichment).   Defendants denied that the dancers are employees and have counterclaimed that, to the extent that any back wages are

owed, those amounts must be offset by amounts paid to the dancers as dance fees.

On July 10, 2018, the parties and their counsel engaged in mediation under the auspices of Magistrate Peter Oppeneer but were unable to arrive at a settlement in principle. Parties continued discussing settlement and on August 23, 2018, arrived at a settlement in principle.  The Settlement Agreement was filed with the Court on October 8, 2018. (Dkt. 170-1).

On January 3, 2019, this Court granted the parties' Joint Motion for Preliminary Approval of Class Action Settlement and parties' Class Notice. (Dkt. 182). The Court held a hearing on March 22, 2019 concerning the motion for final approval.  At that hearing, the Petition for Final Approval was rejected.  The Court noted several defects in the filing, and it further requested additional information. The Court asked for the notices that were actually mailed in the case to the class members.  The Court asked plaintiffs' counsel to give a more detailed description of what was done to notify class members of the settlement, along with an explanation for how counsel concluded that notice was actually provided.  The Court asked counsel to explain why class members who did not receive notice should be included in the class.  The Court asked for a detailed explanation of how plaintiffs' counsel arrived at the figures it used.  The Court asked plaintiffs' counsel to focus on the amount paid to the class, particularly with respect to the reversion fund, to determine the fairness of the settlement and the amount of attorney fees to be paid. The Court asked plaintiffs' counsel to address the propriety of the incentive awards in this case.  The Court required plaintiffs' counsel to modify and resubmit its fee

petition.    The  Court  asked  plaintiffs'  counsel  to  ensure  that  there  are  no inconsistencies  in  the  briefing.    Finally,  the  Court  allowed  class  members  an extension of time in which to file additional claim forms.

The parties now move this Court for a Final Order approving the settlement as follows:

Granting  final  approval  to  the  Settlement  Agreement,  adjudging  its  terms  to be a fair, reasonable and adequate resolution of a bona fide dispute, and directing consummation of its terms and provisions as amended by the provisions set forth in this brief;

Granting  final  approval  to  the  settlement  payments  to  be  paid  to  the participating  settlement  class  members  pursuant  to  the  allocation  formulas  set forth  in  Sections  C  of  the  Settlement  Agreement  and  the  Distribution  List, appended hereto as Exhibit A, with modifications proposed by this briefing;

Dismissing  the  lawsuit  on  the  merits  with  prejudice,  and  barring  and permanently enjoining, to the fullest extent of applicable law, Class Representatives and  all  Class  Members  from  pursuing  any  claims  that  were  released  against Defendants, as set forth in Section F of the Settlement Agreement.

**STANDARD FOR FINAL COURT APPROVAL OF
CLASS AND COLLECTIVE WAGE AND HOUR ACTION
SETTLEMENTS**

An  FLSA  settlement  requires  court  approval  in  order  to  be  valid  and enforceable.    *Walton  v.  United  Consumers  Club,  Inc.*,  786  F.2d  303,  306  (7th  Cir. 1986). Employees can only bargain, waive or modify their right to recovery if the

parties agree to the terms of the settlement and the Court approves the settlement as a fair and reasonable resolution of the bona fide dispute over FLSA provisions, and the settlement is entered as a stipulated judgment. *Lynn's Food Store, Inc. v United States*, 679 F.2d 1350, 1353 (11th Cir. 1982).

Similarly, a Fed. R. Civ. P. Rule 23(b)(3) class action may only be approved if (1) the individual Class Members are afforded an opportunity to request exclusion from the settlement; (2) a hearing has been conducted; and (3) the Court finds that the settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e). In making this determination, the Court "must weigh the probabilities of victory or defeat as indicated by the legal or factual situation presented and determine whether the compromise, taken as a whole, is in the best interests" of the class members. *United Founders Life Ins. Co. v. Consumers National Life Ins. Co.*, 447 F.2d 647, 655 (7th Cir. 1971)(internal quotations omitted). Other factors considered are the complexity, expense, and likely duration of the litigation; reaction of the class to the settlement; the stage of the proceedings and the amount of discovery complete; the risks of establishing liability; the risks of establishing damages; the ability of the defendants to withstand greater judgment; and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974).

In 2018, Federal Rule of Civil Procedure 23 was amended.  In determining whether the relief provided for the class was adequate, the Court is to consider the costs, risks and delay of trial; the effectiveness of any proposed method of

distributing relief; the terms of any proposed award of attorney fees and whether the proposal treats class members equitably relative to each other.  Fed. R. Civ. P. 23(e)(2).  The comments to the rule provide further guidance.  The relief to the class is a central concern, along with the risk to the class involved in pursuing a litigated outcome.  Attorney fees are to be examined in relation to the relief provided to the class.

### EFFORTS TO NOTIFY CLASS MEMBERS AND TO MAXIMIZE SETTLEMENT PARTICIPATION

Per the terms of the Settlement Agreement, class counsel was responsible for mailing the Notice of Settlement to the class members. The Defendants provided addresses for class members in discovery, producing information sheets that many of the dancers had filled out while working at the club. Some of the dancer information sheets were missing; some contained only limited information or information that was entirely inaccurate. (Lindgren decl. para. 1)   As a result, class counsel initially had contact information for only 96 of what at time was assumed to be 109 class members. (Kinne Declaration, 2).[2]

On January 9, 2019, class counsel mailed 96 notices, one to each class member from whom class counsel had an address.  (Lindgren decl., para. 2). The notice duly informed the class members of the nature of the case, their legal rights and options, including how to exclude themselves from participating in the settlement, how to object to the terms of the settlement, the date of the fairness

---

[2] Because the parties have no way to establish a conclusive list of all dancers who worked at Cruisin' Chubbies for the time in question, the parties will assume that the size of the class is the same as the number of dancers the parties do know worked at the club during the requisite time period.

hearing, and the proposed method of distribution of the settlement proceeds. (Kinne Declaration,  3), (Lindgren Declaration, 2).

In addition to the Notice, Class Members were also provided with an individualized Settlement Claim Form that notified each Class Members of the per capita rate that she could expect to receive as well as the pro rata shift share which had been calculated on the basis of the number of shifts worked. (Kinne Declaration,  4).  (Lindgren Declaration, 4)

Counsel made efforts to locate class members for whom they did not have addresses. A legal notice of the settlement appeared in The Wausau Daily Herald (print and online versions) on January 12, 2019; the Journal Sentinel on January 16, 2019 and the Wisconsin State Journal on January 17, 2019. (Kinne Declaration, 6; Lindgren Declaration, 5).

When notices to class members were returned as undeliverable, using LexisNexis SmartLinx® Comprehensive Person Report, updated addresses were obtained and notices were resent. (Kinne Declaration, 7; Lindgren Declaration, 8). These notices were resent between January 14, 2019, and February 19, 2019. (Lindgren Declaration, 8).  There were some dancers for whom counsel had no contact information and no real name, only a stage name.  (Lindgren Declaration, 3).

Between January 27, 2019 and February 25, 2019, Plaintiff Morrissey had an additional 10 dancers that were not in the original list of dancers named by Defendants via discovery, contact class counsel's office to obtain notices and claim

forms.  Notices and claim forms were sent to the dancers between January 27, 2019 and February 25, 2019  (Lindgren Declaration, 6).

As a result of these efforts and the publicity the settlement garnered, dancers called class counsel with updated address information. (Lindgren Declaration, 6).

After the final approval hearing which did not result in final approval, class counsel (and the class representatives) engaged in another round of providing notice to class members.  On April 1, 2019, class counsel provided Plaintiff Jones with a generic Notice of Settlement claim form, a list of all the dancers first names and other identifying information.  (Lindgren Declaration, 11).  This resulted in several additional class members – members who had not received claim forms – requesting claim forms, typically by telephone.  (Lindgren Declaration, 12).  When class counsel's office spoke to dancers who called, class counsel asked each dancer to spread the word about the case and let each dancer know of deadlines. (Lindgren Declaration,13). After the Final Approval Hearing, an additional 30 notices were mailed beyond the number that had been sent at the time of the Final Approval hearing.  (Lindgren Declaration,14).

Class counsel was directly assisted by the class representatives with respect to providing notice.  After the March 22 hearing, Morrissey sent multiple class member dancers private messages via Facebook Messenger informing them about the lawsuit and the settlement.  (Morrissey Declaration, 2).  She provided those dancers with class counsel's email address.  (Morrissey Declaration, 2).  Jones assisted as well.  She posted a list on Facebook with instructions on what to do if

their first names were not on the list.  (Jones Declaration, 2).  Jones also made a posting on other social media.  (Jones Declaration, 4).  She asked dancers for whom she did have contact information to reach out to other dancers for whom Jones did *not* have contact information to make it known to them that they could still file a claim by contacting class counsel.  (Jones Declaration, 3).

Thirty additional notices were mailed, and 13 claim forms were received after the final hearing.  Some of those (five) were received after the April 22, 2019, deadline.  The Court has the discretion to allow late claims to be filed.  *Burns v. Elrod*, 757 F.2d 151, 155 (7th Cir. 1985).  Plaintiffs' counsel has separately moved the Court to allow all these late filers to recover as part of the class.  Assuming the Court allows those latecomers to recover, there have been a total of 52 claim forms filed, of 136 class members.[3]

At the final approval hearing, the Court asked class counsel to explain how class counsel concluded that notice was actually received by the class member. After more than one round of mailing, only a total of four claim forms were returned as undeliverable. (Lindgren Declaration, 10). In other words, plaintiffs' counsel concluded that the claim form was delivered to the class member when the U.S. Postal service did not return the form as undeliverable.

In its order on March 22, 2019, the Court asked plaintiffs' counsel to address whether dancers who did not receive notice should be included in the class.  As plaintiffs' submission show, there were few dancers who could not be found.  (There

---

[3] Defendants object to counting the late filers.  If the late filers are not allowed to recover, it will alter the amount of the total payout for the dancers, as well as the reversion amounts, but by a small factor.

were only four).  Lindgren Declaration, 10.) Regardless, Rule 23 does not require a party to exhaust every conceivable method of identifying and reaching class members before including them in the class.  *Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985).  Plaintiffs have disclosed what they did generally to reach all potential class members.  They mailed the forms to the addresses that were available.  When they were returned, plaintiffs' counsel used databases to search for better addresses, then sent those returned notices again.  This was in addition to using word of mouth by the class representatives, social media that dancers were likely to access, and, where feasible, email and other electronic communication.  This case is different from a run-of-the-mill case because in most class actions, the class members are not actively trying to hide their whereabouts.  Exotic dancing carries with it risks of stalking and violence that are unique to this industry, and it provides strong incentive for dancers to make it difficult for anyone to find them.

If the Court rules that these dancers should not be part of the class, it would require a recalculation of the *per capita* share going to each class member, as well as the *pro rata* share.  The changes would be relatively small, however.

## PARTICIPATION RATE

The participation rate in this case is 38 percent. (Fifty-two claim forms returned out of 136 sent). While this may seem like a low participation rate, given the context of this case, it is high.  Dancers have an acute fear of retaliation from clubs who learn that they have filed a claim.  They make what seems to them to be a logical choice of refusing the settlement proceeds because, in their minds, they

sacrifice the much larger sum they intend to make by continuing to work at exotic dance clubs.  This participation rate far exceeds lower claim rates which have been granted approval. See *Williams v. MGM-Pathe*, 129 F. 3d 1026, 1027 (9th Cir. 1997) (approving a settlement in which $9,900 in claims were submitted against a $4.5 million fund); *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710 (S.D.N.Y. 1970) (approving a settlement with a .04 percent claims rate).

The participation rate in this case is actually higher than two other cases against exotic dance clubs:   *Mays v. Grand Daddy's, LLC*, Western District of Wisconsin Case No. 14-cv-461 and *Mays v. 4 Mile*, Western District of Wisconsin Case no. 14-cv-396  The participation rate in *Grand Daddy's* was 16 percent (36 claims from 236 dancers), and the participation rate in *4 Mile* was 15 percent (43 claims from 291 dancers).   The Western District Court approved both of those settlements.

## BENEFITS TO THE SETTLEMENT CLASSES

The settlement in this case provided that $262,313.96 (the full Settlement Amount of $400,000 less attorney fees of $133,320.00 and costs of $4,366.04) be allocated to class members as follows:

The named Plaintiffs are to be paid $18,000, to be divided as payment of $10,000 to Teriana Jones and $8,000 to Bethany Morrissey for their time and effort as class representatives as well as the risks they took to act as class representatives. These incentive awards would be in addition to what they are otherwise entitled to as Class Members.

From the remaining balance ($244,313.96), Plaintiffs are to make distribution from 50 percent ($122,156.98) to Class Members who did not opt-out of the settlement during the Opt-Out Period and who returned the completed Settlement Claim Form provided with the Notice of Class Action Settlement within that period on a per capita basis. Each per capita share is $ 898.21.  (Kinne Declaration, 14).

The Plaintiffs will make distribution from the remaining 50 percent ($122,156.98) to Class Members who did not opt-out of the settlement during the Opt-Out Period and who returned the completed Settlement Claim form sent with the Notice of Class Action Settlement within that period on a pro rata basis.  (Kinne Declaration, 15).

### CALCULATION OF THE PER CAPITA SHARE

As has been noted in earlier briefing and in this brief itself, the record keeping at Cruisin Chubbies was very poor.  That, coupled with the fact that dancers have an incentive to be hard to find, determining the size of the class in this case was particularly challenging.  Moreover, all parties anticipated that after the case settled, the size of the class would change as more dancers came forward.  It was for that reason that notice was given to the claimants that the amounts in the notices might change based on developments occurring after notice was provided. In the end, class counsel was able to send 136 notices to dancers.  That is the class size, and it is roughly 30 dancers larger than the class size when the case was last before the court.  Accordingly, the *per capita* amount awarded to each dancer is

$898.21 ($122,156.98 / 136 = $898.21).[4] (Kinne Declaration, 15). The amount set forth in the notice sent out to dancers indicated that the *per capita* amount would be $1,120.70.  Kinne Declaration, 14).

The aggregate difference in the amount in the original notices and the current number is $11,569.48.  Plaintiffs' counsel has requested $133,320 in fees, with $66,660 to the Gingras firm and $66,660 to the Moen firm. (Kinne Declaration, 17). To help ensure that claimants receive what was in the original notice, plaintiffs' counsel from the Gingras firm reduces its demand for fees from $66,660 to $55,090.12, with the difference going to class members who filed a claim so that the amount set forth in the original notice will be accurate.  (Kinne Declaration, 17).

### CALCULATION OF THE PRO RATA SHARE

In its order of March 22, 2019, the Court asked the parties to address the *pro rata* awards.  This was a difficult endeavor, because the information with respect to how much each dancer in the class worked was very sparse.  Moreover, the number of dancers in the class was impossible to determine with specificity because no one kept records of who was in the class, with the exception of about 38 dancers.  As noted above, the number of dancers in the class has increased since this case was before the Court on March 22, 2019.  With the new information, class counsel has recalculated the *pro rata* amounts for each of the dancers.

Class counsel began the calculation period on February 22, 2014, three years before this case was originally filed with the Court.  (Kinne Declaration, 15). Class

---

[4] This assumes that the Court will include the four dancers who did not receive notice by mail to be included in the class.  If the Court excludes them from the class, then the *per capita* amount would increase slightly.

counsel then calculated the number of shifts worked from that date until January 3, 2019, the date the order for preliminary approval was signed.  According to the defendant, dancers worked 100 shifts per week in the "summer" (a 26-week period), and 86 shifts per week in the "winter."  (Even these numbers are not perfectly uniform, but it is basically sound). (Kinne Declaration, 15). Class counsel arrived at a grand total of 23,578 shifts worked during that period, by multiplying the weeks at issue by the number of shifts per week worked at the club for all the dancers. (Kinne Declaration, 16). For 38 of the dancers, there was at least some information upon which to base a period of employment.  (Kinne Declaration, 15). A total of 10,908 shifts were assigned to this group.  The unassigned shifts (12,670) were then even divided among the 98 dancers about whom there was no information with respect to how much they worked. (Kinne Declaration, 15). Class counsel assigned 129 shifts per dancer by this method.  Plaintiffs' counsel then determined the amount to pay per shift by dividing the *pro rata* allocation ($122,156.98) by the number of shifts, to arrive at a per shift payment of $5.18.  (Kinne Declaration, 15).

Using a spreadsheet, class counsel then determined each dancer's share of the *pro rata* amount by multiplying the shifts she worked by $5.18.

This changed the amount each dancer was informed she would receive on the original notice sent to her.  (The notice form did advise dancers that any amount on the notice was subject to change).  The table below shows what the responsive dancers were told in the notice that they would receive on a *pro rata* basis, and what they are actually receiving:

14

**Last Name**

|    | Last Name | Shifts | New Pro-Rata | Old Pro-Rata |
|----|-----------|--------|--------------|--------------|
| 1  | Abernathy | 129 | $ 668.22 | $1,301.12 |
| 2  | Adolphson | 129 | $ 668.22 | $1,297.45 |
| 3  | Arnoldussen | 129 | $ 668.22 | $1,301.12 |
| 4  | Avery | 129 | $ 668.22 | $1,301.12 |
| 5  | Ballschmieder | 129 | $ 668.22 | $1,301.12 |
| 6  | Brown | 129 | $ 668.22 | $1,301.12 |
| 7  | Carty | 129 | $ 668.22 | $1,301.12 |
| 8  | Crain | 129 | $ 668.22 | $1,301.12 |
| 9  | Crawley | 129 | $ 668.22 | $1,301.12 |
| 10 | Day | 1053 | $ 5,454.54 | $4,409.95 |
| 11 | Doucette | 129 | $ 668.22 | $1,297.45 |
| 12 | Eake | 936 | $ 4,848.48 | $3,924.40 |
| 13 | Enerson | 129 | $ 668.22 | $1,301.12 |
| 14 | Faber | 129 | $ 668.22 | $1,297.45 |
| 15 | Glass | 129 | $ 668.22 | $1,297.45 |
| 16 | Goodman | 696 | $ 3,605.28 | $2,928.40 |
| 17 | Hannigan | 129 | $ 668.22 | $1,301.12 |
| 18 | Hansen | 468 | $ 2,424.24 | $1,982.20 |
| 19 | Helmke | 129 | $ 668.22 | $1,301.12 |
| 20 | Hilgers | 129 | $ 668.22 | $1,301.12 |
| 21 | Jacobson | 129 | $ 668.22 | $1,301.12 |
| 22 | Johnson | 129 | $ 668.22 | $1,301.12 |
| 23 | Johnson-Herbst | 129 | $ 668.22 | $1,297.45 |
| 24 | Jones | 468 | $ 2,424.24 | $1,982.20 |
| 25 | Kingston | 129 | $ 668.22 | $1,301.12 |
| 26 | Kronberger | 129 | $ 668.22 | $1,297.45 |
| 27 | Krueger | 129 | $ 668.22 | $1,301.12 |
| 28 | Lehocky | 260 | $ 1,346.80 | $1,119.00 |
| 29 | Lince | 129 | $ 668.22 | $1,297.45 |
| 30 | Malchow | 129 | $ 668.22 | $1,297.45 |
| 31 | Markunas | 129 | $ 668.22 | $1,301.12 |
| 32 | Mayo | 129 | $ 668.22 | $1,301.12 |
| 33 | McNutt | 129 | $ 668.22 | $1,301.12 |
| 34 | Messman | 120 | $ 621.60 | $538.00 |
| 35 | Morrissey | 468 | $ 2,424.24 | $1,982.20 |
| 36 | Nankervis | 129 | $ 668.22 | $1,301.12 |

| 37 | Neuman | 702 | $ 3,636.36 | $2,953.30 |
| 38 | Oien | 129 | $ 668.22 | $1,301.12 |
| 39 | Quies | 129 | $ 668.22 | $1,301.12 |
| 40 | Raedel-Johnson | 129 | $ 668.22 | $1,297.45 |
| 41 | Reschke | 1053 | $ 5,454.54 | $4,405.95 |
| 42 | Rice | 129 | $ 668.22 | $1,297.45 |
| 43 | Roth | 129 | $ 668.22 | $1,301.12 |
| 44 | Schultz | 129 | $ 668.22 | $1,297.45 |
| 45 | Spink | 468 | $ 2,424.24 | $1,982.20 |
| 46 | Tarantion | 129 | $ 668.22 | $1,301.12 |
| 47 | Waddell | 129 | $ 668.22 | $1,301.12 |
| 48 | Waters | 129 | $ 668.22 | $1,297.45 |
| 49 | Wenig | 129 | $ 668.22 | $1,297.45 |
| 50 | Wesloh | 180 | $ 932.40 | $787.00 |
| 51 | Widner | 6 | $ 31.08 | $1,301.12 |
| 52 | Williamson | 129 | $ 668.22 | $1,297.45 |
| | | | | |
| | **Totals** | | **$61,688.62** | **$80,988.22** |

The difference in the amount between what was promised in the notices to the dancers, and the updated calculation, is $19,299.60. (Kinne Declaration, 17). Class counsel requests that the Court deduct this amount from the attorney fee award to the Gingras firm and add it to the *pro rata* amounts for each dancer so they receive the amounts promised in the notices. (Kinne Declaration,17). (That reduces the total fee request to $102,450.92, $66,660 for the Moen firm, and $35,790.92 for the Gingras firm).

### AMOUNT TO THE REVERSION FUND

All per capita and pro rata shares that were not claimed by Class Members become part of the reversion fund to be divided equally among the plaintiff class

and the Defendants.

Checks that are mailed to class members but not cashed within 45 days of mailing will be invalidated, and those monies will be added to the Reversion Fund.

Fifty days after mailing out the distributions described above in (c) and (d), the Plaintiff will distribute the Reversion Fund, one half to Defendants, and the remaining half to in equal shares to all class members who filed timely claims and cashed the checks that were sent to them.

With 52 participating class members, $135,918.42 will remain undistributed from the per capita and pro rata shares and will become the Reversion Fund. (Kinne Declaration, 12). Pursuant to the settlement agreement, this amount will be divided equally between the parties: $67,959.21 to the defendants and $67,959.21 to the class members. (Kinne Declaration, 14). The class members' share will be divided and distributed *per capita* to the participating class members. (Kinne Declaration, 14).

Thus, each class member who filed a claim will receive one check that contains her initial per capita share of $898.21 and her pro rata share, the amount of which will vary from a minimum amount of $31.08 (for a dancer who performed six shifts) up to $5,454.54 (which was awarded to a dancer who had performed during 1,053 shifts within the relevant time period), and a second check that contains the final per capita share of the Reversion Fund; each such check will be in the neighborhood of $1,306.91 (or somewhat more if there are uncashed checks to be added to the Reversion Fund). (Kinne Declaration, 18).

The parties and their respective counsel believe that under the terms of the Settlement Agreement, and based upon participation by class members in the settlement, class members are receiving substantial benefits through the settlement.

Finally, it is important to note that the Western District of Wisconsin has approved such reversion clauses in wage and hour lawsuits involving exotic dancers. In both *Mays v. Grand Daddy's* United States District Court, Western District of Wisconsin Case No. 14 CV 461 and *Mays v. 4 Mile* Western District of Wisconsin Case no. 14-cv-396, the Court approved a reversion fund of half of the uncollected proceeds. Other courts, too, have approved such arrangements. *See, e.g., Hart v. RCI Hospitality Holdings, Inc.,* No. 09 Civ. 3043(PAE), 2015 WL 5577713 (S.D.N.Y. Sept. 22, 2015); *see also Trout v. Meggitt-USA Servs., Inc.,* No. 2:16-cv-07520-ODW(AJW), 2018 WL 1870388, *6 (C.D. Cal. Apr. 17, 2018) (in non-exotic dancer setting, approval of reversion clause where release of wage and hour claims applied only to employees who submit claim forms).

### *AMOUNT TO INCENTIVE PAY*

In its March 22, 2019, order, the Court asked plaintiffs' counsel to address the propriety of the incentive awards sought for plaintiffs Jones ($10,000) and Morrissey ($8000). Particularly in employment discrimination litigation, named plaintiffs should be compensated for running the risk of retaliation in the workplace. *McClain v. Lufkin*, 2010 WL 455351 (E.D. Tex. 2010), *Velez v. Majik Cleaning*, 2007 WL 7232783 (D.D. N.Y. 2007). The amount of the incentive award is related to the personal risk incurred by the individual or any additional effort

18

expended by the individual for the benefit of the lawsuit. *Dupler v. Costco*, 76 Fed.R.Serv. 3d 496 (E.D. N.Y. 2010), *In re Currency Conversion*, 263 F.R.D. 110 (S.D. N.Y. 2009). The Court in *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 503 (N.D. Ill. 2015), noted that incentive awards are justified when necessary to induce individuals to become named representatives. *Id.* When determining the proper amount of an incentive award, Courts are to consider the degree to which the class has benefited from the class representatives' actions, and the amount of time and effort the plaintiff has expended in pursuing the litigation. *Id.*

Plaintiffs admit that incentive awards in the amount of $10,000 and $8000 are higher than one would typically see in a case that settled at this value. But the risks taken by the named plaintiffs were far higher than the risks taken by an average class representative. The Court has kept the identities of the class members under seal out of its acknowledgement that employment in the exotic dancing industry presents issues of both privacy and safety that are not found in other industries. There is a stigma associated with exotic dancing, both socially and vocationally. Publicly proclaiming to be an exotic dancer as Jones and Morrissey have done subjected them to this stigma. But even more significantly, publicly announcing that they are exotic dancers subjected them to safety risks. By knowing their real names, a violent or otherwise disturbed patron could track down and stalk either of them, putting their very physical safety at risk, along with their family members. This unique risk thereby justifies a uniquely high incentive award for each of them.

19

Other risks are more commonly encountered, but no less significant in this case. The exotic dancing industry is a small community. Word travels fast, and once clubs discover that a dancer like either Jones or Morrissey have filed a claim against a club, that dancer faces retaliation in the form of being blackballed. Both Morrissey and Jones have placed their entire careers at risk in a way that employees in more conventional industries would not have. This also justifies a higher-than-normal incentive pay award.

Finally, both Jones and Morrissey have contributed significantly to the advancement of the case. As the record reflects, they have been deposed, they attended mediation and they have both provided declarations in support of the case. They have also answered written discovery requests. Moreover, as their declarations filed along with this submission attest, they have been especially helpful in inducing class members to come forward and file claims. Dancers who make a claim also risk facing retaliation. For many, a payoff in this case is simply not worth the far greater sum they would lose if they were to file a claim and risk ending their careers. Additionally, dancers are suspicious of contact from people they do not know. A phone call from a lawyer is far less likely to be answered than a call from someone they know and trust. Jones and Morrissey's efforts to grow the class are uniquely beneficial in this case, further justifying larger-than-normal incentive awards.

### *AMOUNT TO ATTORNEY FEES*

Plaintiffs' counsel has requested $102,450.92 in attorney fees, and $4,366.04

in costs. (Kinne Declaration, 17).  After the reversion fund is distributed, the total amount paid to the class will be $207,223.83.  (Kinne Declaration, 17).  If one adds the $102,450.92 to the $207,223.83 paid to the class, one-third of that sum is $103,223.88, which is slightly more than the figure that plaintiffs' counsel is claiming in fees in this case. (Kinne Declaration, 18). It is also much less than the hourly value of the time plaintiffs' counsel has invested in the case.

### THE COURT SHOULD GRANT FINAL APPROVAL TO THIS SETTLEMENT AGREEMENT

The Settlement Agreement is a fair, adequate and reasonable resolution to the bona fide dispute between the parties. The Agreement provided a procedure for class members to object to the settlement or any of its terms. The notice mailed to class members explained how Class Members could object to the settlement, if they so desired. Class Members had over 45 days from the date of the notice mailing in which to object to the settlement. There were no formal objections to the settlement that were filed or served. There was one informal objection brought to the attention of class counsel and filed with the Court which only objected to the handling of the distribution of the Reversion Fund with half going back to Defendants. The fact that there is only one informal objection supports final approval of the settlement. *See Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 175 (S.D.N.Y.2000) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.") (internal citations omitted).

The Settlement Agreement also allowed class members to exclude themselves from the settlement by following a specific procedure. As with objections, the notice

mailed to the Class Members explained how Class Members could exclude themselves from the settlement, if they so desired. The fact that there were no exclusions supports the fact that the settlement reached in this case was fair and reasonable.

Pursuant to 28 U.S.C. § 1715, on January 10, 2019, defense counsel sent CAFA notifications to the Attorney General of the United States and to the Wisconsin Department of Workforce Development by certified mail, return receipt requested. (Steffek Declaration 2). This service was initiated within 10 days of January 3, 2019 (the date on which the Court issued its Order Granting Motion for Preliminary Approval of Settlement Agreement (Dkt. 182)). (Dkt. 190, Steffek Declaration, 3). All CAFA notices were received on or before January 16, 2019. (Dkt. 190, Steffek Declaration, 4). Pursuant to 28 U.S.C. § 1715(d), the final order may be issued 90 days after service of all CAFA notices, which in this case was April 7, 2019. (Dkt. 190, Steffek Declaration, 5).

In its Order Granting Preliminary Approval, the Court ordered the parties to address several fairness and reasonableness issues; namely, the strength of the case when compared to the settlement amount, the complexity, length and expense of the litigation, whether competent counsel attests to the fairness of the settlement, and the stage of the proceedings at which the case settled.  The parties address each of these factors below.

### A.   STRENGTH OF THE CASE VERSUS THE SETTLEMENT AMOUNT.

The Settlement Agreement fair and reasonable under the circumstances.

Real disputes exist between the parties as to whether Defendants exercised the degree of control over the dancers necessary to create an employer-employee relationship, as evidenced by the denial of Plaintiffs' motion for summary judgment on May 21, 2018.   Furthermore, the Defendants have viable arguments regarding whether Ms. Jones and Ms. Morrissey are proper class representatives, whether the Plaintiffs could ultimately certify a class after trial, whether the alleged violations were willful, whether the alleged violations were intentional, and whether the Defendants would be pushed into bankruptcy were the plaintiffs' class to realize the entire amount of damages they claim.

Generally, when analyzing potential settlement of this matter, the defendants used certain averages and assumptions to calculate a hypothetical "worst day" if the matter were tried and lost. First, from all existing daily dancer listings in their possession, the defendants calculated the average number of dancers or "shifts" per each day of the week. Second, they assumed each dancer was on premises for approximately 5.5 hours per shift. Third, they assumed an hourly wage of $7.25. Fourth, for buffering purposes, they assumed that each month had four Sundays, Mondays, Tuesdays and Wednesdays and five Thursdays, Fridays and Saturdays (as those, generally, are the busiest days of the week). With these averages and assumptions, the defendants calculated a potential average monthly wage exposure as follows:

| Day | Avg. Shifts | Hours/Shift | Wage/Hour | # of Days | TOTAL |
|---|---|---|---|---|---|
| Thursday | 7.73 | 5.5 | $7.25 | 5 | $1,541.17 |

| | | | | | |
|---|---|---|---|---|---|
| Friday | 11.61 | 5.5 | $7.25 | 5 | $2,314.74 |
| Saturday | 13.74 | 5.5 | $7.25 | 5 | $2,739.41 |
| Sunday | 5.68 | 5.5 | $7.25 | 4 | $905.96 |
| Monday | 5.01 | 5.5 | $7.25 | 4 | $799.10 |
| Tuesday | 5.53 | 5.5 | $7.25 | 4 | $882.04 |
| Wednesday | 6.49 | 5.5 | $7.25 | 4 | $1,035.16 |
| **TOTAL:** | | | | | **$10,217.58** |

Multiplying this figure by 36 months totals $367,832.88. The defendants then reduced this figure to $250,000.00 based on several factors, including, without limitation: (1) most dancers only were eligible for two years' damages under the Wisconsin wage and hour laws, as opposed to the three years potentially available under the FLSA; (2) the odds of a successful defense to the independent contractor/employee issue; and (3) the low probability that each class member would appear at trial or otherwise have reasonably sufficient evidence presented on her behalf demonstrating actual time spent at Cruisin' Chubbys Gentlemen's Club. As the class totaled approximately 109 dancers, each class member was allocated a 1/109th share, or $2,293.58.

Only approximately nine dancers formally opted in to the FLSA portion of this matter, so only these individuals could recover double damages under the FLSA. A settlement-purposes value of their claims, therefore, totaled $41,284.44. The other approximately eighty-five dancers would only be entitled to a 50 percent penalty on top of their shares under the Wisconsin wage and hour laws. The

settlement-purposes value of their claims, therefore, totaled $313,073.34.

Based on these figures, the defendants, when determining whether to resolve this case prior to trial, calculated a hypothetical "worst day" at $354,357.78, plus a potential award of the plaintiffs' attorneys' fees. This total, combined with the amount the defendants would have to pay their attorneys to see this matter through trial, had the potential to significantly exceed $400,000.00. In light of that, the defendants determined that $400,000.00 was a fair settlement amount. (It is notable that, at mediation, Magistrate Judge Oppeneer told both the plaintiffs and the defendants that it was his opinion that a reasonable settlement of this matter, for both sides, would be in the range of $350,000.00 to $400,000.00.)

Already submitted to the Court as exhibit D [Dkt. No. 175.4] is Plaintiffs' damages calculation. These figures were based on the hours the two named plaintiffs claimed to have worked, the number of shifts that would have occurred, and on extrapolations about the number of dancers who worked at the club over the relevant time periods. Defendants had threatened to declare bankruptcy if plaintiffs recovered anywhere close to the amounts listed in the plaintiffs' damages spreadsheet. Moreover, there were virtually no records kept to establish how many hours dancers actually worked and the number of dancers who worked. This led to a realistic possibility that plaintiffs would be unable to prove a reliable figure upon which a jury could rely in determining damages.

Another factor considered by the parties were settlements reached against other dance clubs which had been approved by the courts. The case of *Mays v.*

*Grand Daddy's LLC, et al.*, United States District Court, Western District of Wisconsin Case No. 14 CV 461, which settled on March 7, 2016 and involved a class of approximately 230 dancers, settled for an amount of $100,000. Additionally, the case of *Mays v. 4-Mile, Inc., et al.*, United States District Court, Western District of Wisconsin Case No. 14 CV 396, which settled on October 2, 2015 and involved a class of about 291 dancers, settled for an amount of $220,000. Plaintiffs' counsel was involved in both cases and recognized that many of the same risks that existed in those cases (and made the settlement amounts fair in those cases) existed in this case.

More particularly, other factors created substantial risk of victory in the end. There was a risk that the two named plaintiffs would not be deemed to be proper class representatives.  Ms. Jones had separate litigation against Defendants.  But more importantly, strong arguments could be made that neither Ms. Jones nor Ms. Morrissey worked a number of hours consistent with hours worked by the "average" dancer at Cruisin' Chubbies.

Willfulness was another issue that presented a risk.  Evidence existed that the manner in which dancers were paid in the adult entertainment industry was consistent with the manner in which Defendants paid their dancers.  There was a risk that Plaintiffs could not prove willfulness, which would have a substantial impact on damages.  (This same argument applies to proving intentional conduct). Moreover, if Plaintiffs were to win a verdict anywhere close to their damages calculation, they would almost certainly force the Defendants out of business and

26

into bankruptcy.  That would have greatly decreased the value of the case, but more importantly, many of the class members continued to work for Defendants.  It would have also deprived them of their jobs.

However, by far the most significant risk in the case concerned whether the Court would have decertified class based on the evidence at trial.  (Courts can decertify a class at any time prior to judgment. *Bridgeview Healthcare Ctr. V. Clark*, 2015 U.S. Dist. LEXIS 45710 (N.D. Ill.), *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 420 (N.D. Ill., 2003).  A defendant cannot rely on its lack of record keeping as a defense. *Farmer v. DirectSat United States*, 2010 U.S. Dist. LEXIS 105738, *34-35. Regardless, Plaintiffs still bore the responsibility to offer a jury evidence from which it could base a damages verdict.  There existed a very strong possibility that Plaintiffs could not meet that burden.  The number of shifts worked by dancers varied wildly, as did the time frames during which they worked at Cruisin' Chubbies.  Plaintiffs would have struggled to offer a jury a set of "typical" dancers from which to extrapolate an average loss that could have been applied to all the dancers in the class.  These variances presented an enormous risk of decertification.

Given these risks, the size of the settlement is reasonable given the risks of the case.

## B.    THE COMPLEXITY, LENGTH AND EXPENSE OF THE LITIGATION.

The settlement amount, when viewed in the context of the complexity, length and expense of the litigation, is fair.

27

The factual issues were complex.  As the Court knows from the Plaintiffs' motion for summary judgment, there were issues with respect to whether and how dancers were paid.  The number of shifts each dancer worked, and even the identity and total number of the dancers who worked at Cruisin' Chubbies over the relevant time period was unknown, and would have been difficult to prove.  This matter was further complicated by Defendants' haphazard record keeping.

The legal issues were complex.  On the merits, there was the issue of whether the dancers were employees or subcontractors.  There was also the issue of whether the pay dancers did receive should be offset against what they should have earned.  Willfulness presented another complex issue.  With respect to class certification, a highly complex issue was whether Plaintiffs could overcome the variances in hours worked and type of work performed by the class members to keep the class certified.

One additional item of complication unique to this type of case is that many of the class members do not wish to have their identities revealed.  It can complicate bookings at other clubs when those clubs are aware that a dancer has testified or actively participated in a case against another club.  But because of the type of work performed, conspicuous participation in a case can cause embarrassment to dancers who have not told their families the type of work they do, and more importantly, it can also cause serious safety issues.  Dancers are particularly at risk from stalkers, and participating in a public trial can make it easier for stalkers to obtain dancers' true identities and threaten them.  This settlement greatly mitigated that risk.

The length of the litigation further supports the fairness of the settlement. Litigation in this matter commenced on February 22, 2017, and the case settled on August 30, 2018.  No fewer than two motions were briefed and decided by the Court. Massive numbers of documents were produced in discovery, and many depositions were taken. When the case settled, many other depositions were on the verge of being taken.  Clearly, this case was not an example of a case in which filing the complaint was a mere formality.

### C.   COMPETENT COUNSEL ATTESTS TO THE FAIRNESS OF THE SETTLEMENT.

As the record reflects, both Plaintiffs' and Defendants' counsel are competent with respect to class action settlements, particularly those involving adult entertainment.  (Kinne Decl. Dkt. 178, ¶6, 8.)  Class counsel is intimately familiar with the facts, strengths and weaknesses not only of this case, but other cases like it.  The case of *Mays v. Grand Daddy's LLC, et al.*, United States District Court, Western District of Wisconsin Case No. 14 CV 461, which settled on March 7, 2016 and involved a class of approximately 230 dancers, settled for an amount of $100,000. Additionally, the case of *Mays v. 4-Mile, Inc., et al.*, United States District Court, Western District of Wisconsin Case No. 14 CV 396, which settled on October 2, 2015 and involved a class of about 291 dancers, settled for an amount of $220,000. Plaintiffs' counsel was involved in both cases and recognized that many of the same risks that existed in those cases (and made the settlement amounts fair in those cases) existed in this case.

29

Additionally, outside counsel has provided an opinion that the settlement is fair.  Based on the Attorney Heath Straka's review of the case file, his particular experience with this case and others like it while he worked at Gingras, Cates & Wachs, and his general experience with class and collective action cases, it is his opinion that this settlement is fair and reasonable. (Straka Decl., para. 10.) It is his opinion that if plaintiffs' counsel were to go to trial with this case, there is a reasonably substantial likelihood that the class would be decertified, or that plaintiffs would be unable to prove damages to the necessary degree of specificity. (Straka Decl., para. 10.[5])

## D. THE STAGE OF THE PROCEEDINGS AT WHICH THE CASE SETTLED PROVES THAT THE SETTLEMENT WAS FAIR.

This matter settled on August 30, 2018, only 12 weeks before trial was scheduled to commence, and only seven days before pretrial submissions were due to the Court.  Settlement at this last stage of the case, after massive amounts of resources had been dedicated to the case, and after mediation had, at the time, appeared to have failed, proves that this case was fairly fought to a reasonable resolution.

## E. OTHER RULE 23 CONSIDERATIONS

Rule 23 makes it clear that relief to the class is a central consideration. With respect to the reasonableness of the amount of the relief, as demonstrated above, the settlement amount is fair.  Given the number of dancers in the class, this

---

[5] Attorney Straka is an experienced class action attorney.  He has acted as co-counsel in many class action cases in the Western District of Wisconsin.  (Straka Decl., para. 5.)

settlement was larger than the settlements in either the *Mays v. 4 Mile* or the *Mays v. Granddaddies* cases, both of which were approved by this court. The case settled at the top end of the range recommended by the mediator ($400,000). Even if one subtracts the likely reversion amount from the $400,000 figure, the settlement amount of the case is $332,040.79, which is very close to the bottom of the range recommended by the mediator ($350,000). The actual relief to the class amounts to more than half of the nominal settlement amount, and 61 percent of the amount Cruisin Chubbies will actually have to pay in this case. Moreover, competent counsel has reviewed the settlement amount and believes it to be fair, based on their experience.

The proposed distribution of the proceeds will be effective. Every dancer who has filed a claim has already shown the initiative to be involved and engaged. Mailing the proceeds to the dancers will be an effective method of distribution, given that class counsel knows both that the addresses are current and the recipients are actively engaging in the litigation.

The proposal also treats class members equitably. All of them are receiving the *per capita* amount. Dancers are then being awarded a *pro rata* amount based on the time they spent at the club, or based on an estimate of that time. Because of the defendants' poor record keeping, there is simply no way to fashion a perfectly accurate method of allocating the relief in the case. But each dancer was informed of the proposed *pro rata* amount attributed to her, and there were no objections to those allocations. Additionally, similar methods (with similar problems) were

31

implemented in the *Mays v. 4 Mile* or the *Mays v. Granddaddies* cases, which this court approved.

Moreover, the attorney fees are appropriate given the relief that was awarded to the class. Not only are the fees less than one third of the actual class recovery, they are also less than one third of the amount defendants will pay in this case. The defendants will pay $332,040.79, one third of which is $110,680.15, which is greater than the plaintiffs' fee request.

## CLASS COUNSEL HAS ADDRESSED THE COURT'S SPECIFIC CONCERNS.

### A. Counsel has provided the Court with the notices that were actually mailed to the class members.

In a previous but separate filing, class counsel has provided the Court with all of the notices that were actually mailed or delivered to the class.

### B. Class counsel has provided the Court with a detailed explanation of how notice was provided, and how counsel concluded it was provided.

As described above, class counsel explained how notice was provided to the class. In most cases, it was mailed to a provided or discovered address. If the notice was returned, class counsel used a database to determine a more accurate address, and it was mailed again. In some cases, dancers directly contacted class counsel asking for notice and a claim form. In those cases, it was either mailed or emailed. In addition to all of these efforts, the class representatives used word-of-mouth to

spread news of the settlement, with instructions to contact class counsel. Newspaper ads were published, and publicity on social media was utilized. In cases where either the class representatives or class counsel had access to an email address, email addresses were utilized. Only four notices were completely undeliverable, by mail or email.

In the cases of mailed notices, class counsel assumed that if the notice was not returned, the class member received the notice.

C. *Class counsel has addressed whether the four class members who did not receive a claim form by mail should be considered part of the class.*

Given the various means of notice and publicity utilized by class counsel and the class representatives, the Court should conclude that the four class members who did not receive a mailed notice or claim form still received notice. In the event the Court excludes those four members from the class, the settlement amounts will slightly change.

D. *Class counsel has provided the Court with a detailed explanation of how it calculated the amounts to be provided to each class member.*

Class counsel has described in detail how both the *pro rata* and the *per capita* amounts were calculated. Briefly, the *per capita* amount was calculated by dividing $122,156.98 by 136, which is the number of dancers in the class, assuming the four dancers who did not receive notice by mail are counted in the class. Plaintiff arrived at a figure of $898.21. Class counsel then multiplied that number by the

number of claimants (52), to arrive at a figure of $46,706.92 for the total *per capita* payout.   Class counsel then asked the Court to approve a supplement from class counsel attorney fees to increase the total *per capita* payout by $11,569.48.

Class counsel calculated the *pro rata* amount by determining the total number of shifts worked over almost a five-year period, and then allocating those shifts to the dancers in the class.   There were some dancers for whom specific information was known regarding the amount they worked, and those dancers were allocated shifts based on that information.   For all the others, a flat average was utilized.   The amount per shift paid to the dancers was determined by dividing $122,156.98 by the total number of shifts worked during the period (23,578). Plaintiff's counsel then requested a supplement to this number, as well, raising the total *pro rata* payout by $19,299.60.

> E. *Class counsel focused upon the amount paid to the class from the settlement with special attention paid to the reversion fund and attorney fees in terms of fairness to the class.*

As described above, the class will receive the majority of the $400,000 settlement.   Class counsel's request for fees is less than one third of the actual recovery to the class.   Even reducing the total settlement amount by the sum of the reversion fund, the settlement amount is very close to the amount recommended at mediation by the neutral mediator.

> F. *Class counsel has addressed the propriety of the incentive awards*

34

*requested in this case.*

Because of the stigma associated with exotic dancing, the safety risks inherent in the job, and the significant amount of work the class representatives did on behalf of the class, the Court should approve the incentive payments as described earlier in this brief.

> ### G. Class counsel has filed an amended fee petition and accompanying documents with the Court.

Class counsel has filed an amended fee petition and accompanying documents. Class counsel has also reduced the fees it is requesting in this matter when compared to its original petition.

> ### H. Class counsel has separately moved to allow the five late filers to recover in this matter.

For the reasons set forth in the separate filing regarding the five late filers, the Court should grant the motion and allow them to be part of the recovery. Communication with the class in this case was especially difficult, as described elsewhere in this brief. If the court does not allow the five later filers to participate, the amount recovered by the class will change, as will the amounts of the reversion fund.

> ### I. Class counsel has specifically addressed the factors in Rule 23.

As set forth above, class counsel has addressed all the matter specifically set forth in Rule 23.

## CONCLUSION

For the reasons set forth above, and those articulated in documents relating to the parties' joint motion for preliminary approval, Dkt. #'s 174 through 182, the parties respectfully request that the Court enter an Order, granting final approval of the settlement of this dispute on the terms and amounts set forth in the Settlement Agreement and dismissing this case with prejudice.

Dated: May 6, 2019

s/ Paul A. Kinne
Paul A. Kinne, SBN 1021493
Gingras, Cates & Wachs, LLP
8150 Excelsior Drive
Madison, WI 53717
Tel: (608) 833-2632
Fax: (608) 833-2874
E-mail: kinne@gcwlawyers.com

s/ Kara M. Burgos
Kara M. Burgos, SBN 1020960
Moen Sheehan Meyer Ltd
201 Main St Ste 700
La Crosse WI 54602-0786
Tel: (608) 784-8310
Fax: (608) 782-6611
Email: kburgos@msm-law.com

Attorneys for Plaintiffs

Dated:  May 6, 2019

s/ Anthony J. Steffek
Anthony J. Steffek, SBN 1053615
Davis & Kuelthau SC
318 S Washington St Ste 300
Green Bay WI 54301-4242
Tel: (920) 435-9378
Fax: (920) 435-9391
Email: asteffek@dkattorneys.com

Attorneys for Defendants